TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN









TEXAS
COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

 

 

 

NO. 03-05-00005-CV

 

 

 

Appellant,
THPD, Inc.//Cross-Appellant, Continental Imports, Inc.

 

v.

 

Appellees,
Continental Imports, Inc., TBT, Inc. d/b/a Auto Gallery

and Norm P.
Taylor//Cross-Appellee, THPD, Inc.

 

 

 

FROM THE DISTRICT COURT OF WILLIAMSON COUNTY, 26TH JUDICIAL DISTRICT

NO. 96-495-C26, HONORABLE BILLY
RAY STUBBLEFIELD, JUDGE PRESIDING

 

 

O P I N I O N

 

                        THPD,
Inc., and Continental Imports, Inc., each appeal a judgment that awarded THPD
$83,932.00 on causes of action against Continental for conversion, theft, and
negligence; granted THPD declaratory relief; and awarded THPD $125,000 in
attorney’s fees.  The underlying facts, presented in evidence during a two-week
jury trial, involve a series of commercial transactions that we will describe
below.  To summarize the parties’ arguments on appeal, Continental asserts that
there is no legal support for any of the relief awarded against it, while THPD
urges that the district court erred in refusing to impose joint and several
liability on Continental for a much larger damages award the jury imposed
against a co-defendant.  We will affirm the district court’s judgment in part,
and reverse and render in part.

 

 

BACKGROUND

Norm Taylor
and Auto Gallery

                        At
the center of the underlying controversy was a used car dealer named Norm
Taylor.  Taylor had been in the car sales business since 1979.  In 1986, Taylor went into the wholesale car business for himself, obtaining a Texas dealer’s license
and incorporating a company, TBT, Inc.  In approximately 1991 or 1992, Taylor opened a retail outlet on I-35.  At relevant times, Taylor and TBT did business
under the name “Auto Gallery.”  We will refer to Taylor, TBT, and Auto Gallery
simply as “Taylor” except when the distinction is relevant.

                        Several
witnesses explained that car dealers commonly finance their inventories through
an arrangement known as “floor planning.”  Under these arrangements, generally
speaking, investors loan funds to car dealers to finance car purchases and
carrying costs, with the loans being secured by the cars as collateral.  As
each car is sold, according to the evidence at trial, the dealer typically
repays the corresponding loan, plus accrued interest, and any fees or other
charges that might be required under the specific floor-planning arrangement.

                        During
the relevant time period, Taylor described having continual problems generating
sales revenues sufficient to cover his loan repayments and interest, not to
mention his overhead.  As revenues proved inadequate to meet his obligations as
they came due, Taylor resorted to covering the shortfalls with funds loaned to
finance other cars, in the expectation or hope that he might ultimately make up
the difference with revenues generated in subsequent sales.  Instead, the
shortfalls, as Taylor described it, “just snowball[ed].”  In late 1993 or early
1994, the floor planner who had been financing Taylor’s operations since 1988
or 1989, Milton Neeley, ordered an accounting.  The accounting revealed that Taylor had been defrauding Neeley and was “upside down” or “out of trust”—outstanding
obligations exceeded the value of collateral—by approximately $150,000.  Neeley
ended their floor-planning arrangement, threatened to sue Taylor, and Taylor eventually agreed to repay Neeley the amount outstanding in installments of $2,000
or $2,500 per month.

 

Dr. Hendrix
and THPD, Inc.

                        In
March 1994, shortly after Neeley ended their floor-planning relationship, Taylor entered into a floor-planning arrangement with Dr. Thomas Hendrix.  Hendrix, an
ophthalmologist in Taylor, Texas, was a “muscle car” enthusiast and frequent
visitor to Auto Gallery.  The evidence was disputed concerning the extent to
which Hendrix was aware of Taylor’s history with Neeley.  Taylor and Hendrix
memorialized their arrangement in a one-page “Ag[]reement with Auto Gallery.”
Under the Agreement, Hendrix agreed to loan money to Taylor to purchase cars.  Taylor, in turn, agreed that “Hendrix would be repaid for the cars when they are sold and
funded,” including “reimburse[ment] for money lent on the car plus 1 (one) % of
the money lent on the car and plus interest accrued on the car from time of
purchase to the time of funding. . . . The interest rate shall be 10% or the prime
rate which ever is higher.”

                        By
May 1996, Taylor estimated that Hendrix had about $300,000 in outstanding loans
to him.  Taylor described Auto Gallery’s financial condition at this time as
“very poor.”  He attributed these difficulties to “very poor decisions on
purchases.  We got very heavy into the muscle car market, [a] very
individualized market.”  Consequently, “the daily sales were not happening the
way you need . . . to cover your monthly expenses, your rent, your insurance,
[and] I still had to purchase vehicles that I could sell on a quick basis to
generate any type of income.”  He added, “it just snowballs.  You’re borrowing
from Peter to pay Paul.  The bank calls and says, . . . ‘You’re X number of
dollars overdrawn this morning.  You need to get those funds in the bank.’  I
had to find some—I had to sell cars at losses . . . it was my decision to take
losses . . . just to get funds in the bank to cover that day and hope to make
it better tomorrow.”

                        By
early 1996, Taylor’s monthly expenses included—along with amounts owed to
Hendrix, Neeley, and payments due under another note to an investor named Harry
McAdams—approximately $3,000 in monthly rent to Hendrix at a new location for
Auto Gallery on FM 620 near Cedar Park.  Taylor regarded this new location as
his “last shot . . . to get this turned around.  That building was . . . my
hope, that by magic, by building that showroom, having these beautiful cars,
that we would . . . strike gold.”

                        Between
August 1995 and early 1996, Taylor bounced several checks, including some
checks to Hendrix.  At the time, Taylor and Hendrix were using a joint checking
account.  In the ensuing months, Hendrix closed the joint account and undertook
various measures that served to provide him greater protection in his dealings
with Taylor, though the evidence was disputed whether this was Hendrix’s
specific motivation.  Hendrix formed a corporation, THPD, Inc., through which
he would thereafter conduct his floor planning with Taylor.[1] 
The corporation did business as “AG Auto.”  We will refer to this entity as
THPD, as it is the party on appeal.

                        Hendrix
also testified that he began attempting to reduce the amount of loans
outstanding to Taylor.  Furthermore, on May 6, Hendrix executed a promissory
note and guarantee with Taylor.  The named payee on the note was THPD and the
maker was TBT.  The note obligated TBT to pay THPD a principal amount of
$300,000 on or before August 6, 1996, plus interest accruing at an annual rate
of ten percent.  The note was secured by a security agreement, executed on the
same day, that granted THPD a security interest in TBT’s vehicle inventory
“whose purchase price is paid in whole or in part with the proceeds of any
loans” from THPD to TBT, other vehicles to be identified in schedules, and “all
proceeds of all sales and other dispositions of all items of Collateral in
which [THPD] has a security interest.”

 

The downward
spiral continues

                        The
jury heard evidence that Taylor continued to struggle financially during the
summer and fall of 1996, bouncing numerous checks and bank drafts.  Attributing
his acts to “pride, ego, embarrassment” and his hope that he could eventually
“make everything right,” Taylor engaged in a series of fraudulent financial
machinations to keep Auto Gallery afloat.  These actions included double- or
triple-floor planning cars—obtaining multiple loans secured by the same cars as
collateral.  In addition to what he estimated was $250-270,000 he had obtained
from THPD, Taylor had obtained $100,000 from a company named Lorfam, and
$75-80,000 from Harry McAdams.

                        The
jury heard evidence that Taylor’s scheme was aided by the fact that Hendrix,
unlike typical floor planners, and contrary to the terms of the security
agreement between THPD and Taylor, did not keep physical possession of the
original certificates of title to the cars that served as collateral for THPD’s
loans.  Instead, throughout the course of their dealings, Hendrix allowed Taylor to retain the titles himself at Auto Gallery.  Taylor ultimately used some of these
titles in obtaining double- and triple-financing on the corresponding
vehicles.  Consequently, some of the titles ended up in the possession of
creditors other than THPD.  There was also evidence that Hendrix failed to
independently verify, or checked only occasionally, whether Taylor actually
held the titles to the vehicles at Auto Gallery that Taylor had represented
were collateral securing THPD’s loans.  Rather, Hendrix would typically visit
Auto Gallery two or three times a week, compare the cars he saw with inventory
lists generated by Taylor, and rely on Taylor to answer any questions regarding
the cars in which he or THPD had an interest.  This provided Taylor an
opportunity to misrepresent that THPD had an interest in cars on the Auto
Gallery lot when it actually did not and, conversely, hide from Hendrix that he
had sold or exchanged cars that had been part of THPD’s floor plan without
accounting for the proceeds.  Further obscuring the state of THPD’s collateral,
Hendrix, by at least May 1996, had begun permitting Taylor to “roll over”
proceeds from the sale of floor-planned cars into the purchase of additional
cars rather than requiring car-by-car repayment.

                        As
 Taylor put it, “it was a madhouse to keep one floor planner from talking to
another.”  The floor planners eventually did talk to one another, resulting in Taylor’s ultimate downfall.  In late December 1996, Hendrix shut down Auto Gallery.  Taylor was eventually prosecuted and pled guilty to felony criminal charges of
misappropriation of fiduciary property.

 

THPD’s claims
against Continental

                        Litigation
ensued as numerous parties asserted overlapping claims to Taylor’s inventory. 
The vehicles remaining on Auto Gallery’s lot when it closed were placed in
receivership.  The district court gradually sorted out the competing claims
and, by the time of trial, the sole remaining parties were Hendrix and THPD,
Taylor and TBT, and Continental.  In addition to seeking recovery under the
note with Taylor, THPD sought damages from Taylor and Continental for the fact
that THPD’s collateral in the Auto Gallery inventory proved to be inadequate to
cover Taylor’s outstanding obligations to it.  THPD quantified these damages,
net of collateral THPD was able to sell and Taylor’s restitution payments, as
$277,794.97.  It presented a damages model that identified and assigned values
to twenty-one cars in which THPD had claimed a security interest but ultimately
could not recover.

                        THPD’s
allegations against Continental centered on the activities of Paul Kitchen. 
Kitchen was a nationally-recognized expert in the wholesale market for
pre-owned “high-end” specialty cars, such as Corvettes, “hard-to-find
Mercedes,” and Porsches.[2] 
In March 1996, Kitchen, through his company, Specialty Autos, entered into a written
floor-planning arrangement with Continental.  We will refer to Kitchen and
Specialty Autos simply as “Kitchen” except where the distinction becomes
relevant.  Under this arrangement, Continental provided Kitchen up to $1
million in funds to finance Kitchen’s car purchases, an office at its
dealership location, clerical assistance, and certain insurance coverage on the
vehicles.  In return, Kitchen agreed to pay Continental a flat $200 fee per car
purchased, plus an additional $100 that went into a reserve account.  Kitchen
was responsible for any repair or shipping expenses on the cars, as well as for
repaying Continental’s financing on each car, including accrued interest, when
sold.[3] 
Any net profit collected on each sale went to Kitchen, and he was permitted
periodic draws against accumulated profits, but he also bore the risk of any
losses.

                        Another
important feature of Kitchen’s floor-planning arrangement with Continental was
that, in contrast to Taylor and Hendrix, title to cars Kitchen purchased with
funds advanced by Continental were placed in Continental’s name, and
Continental kept the certificates of title in a locked fireproof safe at its
offices.  Kitchen testified that, as the vehicles were titled to Continental,
he operated under Continental’s dealer license.

                        Kitchen
completed approximately 190 wholesale transactions during 1996.[4] 
Of these, less than ten of Kitchen’s purchases and less than ten of his sales
were with Taylor, and about half 

 class=Section2>

of this group of transactions
involved cars that Kitchen or Taylor bought and later sold back to the other. 
Several of the issues on appeal concern interests THPD claimed in four specific
cars:

 

 

$                      1965
Chevrolet Corvette.  Kitchen sold this car, then titled to Continental,
to Taylor but later repossessed it for non-payment.  Continental later sold the
car.  THPD claimed Taylor had, in fact, paid for the car, that title had passed
to Taylor and that THPD thereby possessed a security interest in the car.  THPD
alleged that Kitchen and Continental’s actions constituted conversion and
theft.

 

$                      1965
Mustang & 1982 Ferrari.  Taylor transferred these cars, in
which THPD claimed a security interest, to Kitchen in response to Kitchen’s
attempts to collect the $50,000 purchase price of a 1994 Mercedes S420 that
Kitchen had previously sold Taylor.  Continental later sold both the Mustang
and the Ferrari.  THPD claimed that Continental took these cars subject to its
security interest and that its actions constituted conversion.

 

$                      1992
Chevrolet Corvette.  Hendrix testified that he financed $18,500 toward Taylor’s  purchase of this car on July 22, 1996.  Taylor purchased the car on August 10. 
On September 11, Taylor sold the car to Kitchen (Continental) for $18,500. 
However, Kitchen did not take physical possession of the car until January
1997, after Auto Gallery had been shut down. Continental eventually sold the
car.  THPD claims that Continental had purchased the car subject to its
security interest and that its actions constituted conversion.

 

                        In
addition to its claims involving these four specific cars, THPD sought to hold
Continental liable for all of the losses it incurred due to Taylor’s fraudulent
actions.  Its core contention in this regard was that Kitchen and Taylor had an
arrangement whereby Kitchen would buy cars from Taylor and, rather than taking
physical possession, would leave the cars at Auto Gallery for Taylor to sell at
retail—allegations, in other words, that Kitchen, with Continental funds, was
in effect financing a portion of Taylor’s inventory and benefitting from
Taylor’s sales of those cars.  THPD pointed to the following transactions in
support of its theory:

 class=Section3>

$                      1966
Dodge Coronet.  Hendrix testified that this car was on the Auto Gallery
lot not later than April 12, 1996, and that THPD later financed it.  On April
12, Taylor sold the car to Kitchen (Continental) for $22,500.  It is undisputed
that Kitchen never took physical possession of the car.  On May 13, Taylor bought back the car from Kitchen for $25,000.  Taylor then sold it to a buyer in Florida.

 

$                      1993
Chevrolet Corvette.  Hendrix testified that THPD financed $23,500 for Taylor’s purchase of this car on May 6, 1996.  Taylor sold the car on May 14 to Kitchen
(Continental) for $22,000.  On May 29, Taylor bought back the car from Kitchen
for $22,750.  On same day, Taylor sold it to another dealer for $22,000.  
Hendrix testified that he was unaware that Continental had owned the car
between May 14 and May 29.

 

$                      1954
Jaguar.  Hendrix claims that Taylor had this car listed as a consignment
in April 1996.  On June 8, Hendrix testified that Taylor induced him to finance
$37,500 toward the purchase of the car from its owner, claiming that Taylor “probably had a deal up in Michigan.”  The car was trailered to Michigan in June,
but no sale occurred.  On August 29, Taylor sold the car to Continental for
$35,000.  However, the car remained in the Auto Gallery showroom through the
dealership’s closing in late December.  Hendrix claims that while he understood
Continental might be buying the car, he wasn’t informed that the sale had been
completed.[5]

 

$                      1992
Chevrolet Corvette.  This is one of the four cars that was the subject
of THPD’s conversion claims.  Hendrix claims that the car remained at Auto
Gallery, mostly in the showroom, through the dealership’s eventual closing in
late December.  Hendrix claims that Taylor never informed him that the car had
been sold.

 

Hendrix claimed
that Taylor offered these cars for retail sale at Auto Gallery even during the
periods in which it turned out that Continental had title.  THPD urged that
Kitchen’s and Taylor’s actions constituted a violation by Continental of dealer
regulations prohibiting off-site sales of cars without proper signage.  See
16 Tex. Admin. Code § 111.10(2) (1995).  It was undisputed that Kitchen did not
personally sell any of the cars at Auto Gallery, that Taylor, not Kitchen, sold
the 1966 Dodge Coronet and 1993 Chevrolet Corvette, and that Taylor had to
repurchase the cars from Kitchen before conveying them to the ultimate buyers. 
However, THPD pointed to these “flips” of the cars back to Taylor as evidence
of Kitchen’s awareness that Taylor was selling Continental’s cars at retail.

                        Kitchen,
as well as Taylor, denied having any such arrangement.  Kitchen further denied
any knowledge that Taylor was actively attempting to sell the cars, explaining
that he had assumed Taylor had simply received unsolicited inquiries.  As for
why he did not take possession of the cars immediately, Kitchen claimed that he
simply had not had time to pick up the Dodge and 1993 Corvette before Taylor offered to buy them back.  As for the two cars he left at Auto Gallery for more
extended periods, Kitchen explained that he wanted to hold them for later sale,
when he could get a better price.[6] 
He added that both cars required an indoor, secure location like Auto Gallery
and that Taylor was agreeable to his leaving the cars—which were apparently
viewed as a “draw” for customers—at Auto Gallery.

                        THPD
attempted to link this alleged scheme to Taylor’s fraud by contending that the
presence of the cars at Auto Gallery led Hendrix to assume that the cars were
part of THPD’s collateral, thereby delaying his discovery of Taylor’s
wrongdoing.  In fact, there was evidence that Taylor made affirmative
misrepresentations to Hendrix that some of the cars titled to Continental were
part of THPD’s floor plan.  Kitchen denied any knowledge of these
misrepresentations, that he had any intent to harm Hendrix, or that Taylor had asked him to leave the cars at Auto Gallery for any reason.  Taylor, in fact,
denied that Kitchen knew of his wrongdoing.[7]

 class=Section4>

Verdict and
judgment

                        The
district court submitted multiple liability theories against both Taylor and
Continental.  The jury found that Taylor had committed fraud against Hendrix
and THPD, that he had committed theft, that he had breached his fiduciary duty
to THPD, and that he had transferred the 1965 Mustang and 1982 Ferrari (the
cars that Taylor had traded to Kitchen when Kitchen was trying to collect on
the 1994 Mercedes S420) with the intent to hinder THPD’s security interests.  
The court further instructed the jury that Taylor had breached his contract
with THPD and intentionally misapplied funds provided under his agreement with
THPD or titles to vehicles financed by THPD, and submitted only the amount of
damages under each theory.  The jury awarded $277,794.97—the total amount THPD
had attributed to its loss of collateral—on THPD’s claims for fraud, breach of
fiduciary duty, and misapplication of funds or titles.  The jury awarded
$35,208 for theft and just over $270,000 for breach of contract.  The jury also
found that Taylor had acted with malice and awarded $250,000 in exemplary
damages.

                        The
jury failed to find that Continental had knowingly participated in Taylor’s breach of fiduciary duty, acted in concert with Taylor in misapplying funds or
titles, aided or attempted to aid Taylor’s misapplication of funds or titles,
or aided or attempted to aid Taylor’s theft.  It also failed to find that
Kitchen and Continental were engaged in a joint venture or that Kitchen was an
employee of Continental, but found that Kitchen had been acting in furtherance
of a mission for Continental’s benefit and subject to its control.  However,
the jury found that Continental had committed theft, awarding $21,618 (which,
the parties agree, reflects the value of the 1965 Corvette); committed
constructive fraud, again awarding $21,618; and intentionally interfered with
the contract 

 class=Section5>

between Taylor
and TBT and THPD, awarding $28,550.[8] 
The jury also found that Continental converted all four of the vehicles made
the basis for those claims and awarded damages corresponding to the sale prices
Continental had received for each vehicle—$25,000 for the 1965 Corvette, $9,950
for the1965 Mustang, $19,500 for the 1982 Ferrari, and $18,600 for the 1992
Corvette.

                        The
jury also found that the negligence of Taylor and TBT, Continental, and THPD
and Hendrix had proximately caused THPD and Hendrix’s damages, which it again
determined to be $277,294.97.  It apportioned responsibility 85 percent to
Taylor and TBT, 10 percent to THPD and Hendrix, and 5 percent to Continental.

                        Predicated
on the jury’s finding that Taylor had committed fraud, had committed theft, or
that THPD had incurred damages from Taylor’s misappropriation of funds or
titles, the district court submitted an issue inquiring whether Continental was
“part of a conspiracy that damaged THPD.”  The jury found in the affirmative. 
However, the charge did not request, and the jury did not find, any amount of damages
that were proximately caused by the conspiracy.

                        The
jury failed to find that Continental had acted with malice.  It made further
findings regarding the amount of THPD and Continental’s attorney’s fees.

                        Following
the verdict, the district court disregarded the jury’s finding regarding a
conspiracy between Taylor and Continental on the grounds that THPD failed to
obtain a finding as to the amount of damages that the conspiracy had
proximately caused.  THPD elected to recover from Taylor and TBT for fraud,
breach of contract, and breach of fiduciary duty.  The district court awarded a
lump sum of $277,794.97 in actual damages, the $250,000 in exemplary damages
found by the jury, and attorney’s fees.  Against Continental, the district
court awarded a lump sum of $83,932.00 based on THPD’s claims for theft,
conversion, and negligence.  The court further rendered a declaratory judgment
that THPD had a “superior security interest in and right of possession of” the
1965 Corvette, 1965 Mustang, 1982 Ferrari, and 1992 Corvette.  It additionally
awarded THPD $125,000 in attorney’s fees and prejudgment interest.

                        Both
THPD and Continental have appealed the judgment.  Taylor and TBT have not
appealed.

 

DISCUSSION

                        THPD
brings four issues, contending chiefly that the district court erred in
disregarding the jury’s finding that Continental was “part of a conspiracy that
damaged THPD” and refusing to impose, based on that finding, joint and several
liability against Continental for the entire amount of fraud damages awarded
against Taylor, including exemplary damages and attorney’s fees.  In six
issues, Continental challenges the sufficiency of the evidence supporting the
jury’s findings that it converted four cars and committed theft, contends that
it owed no duty to Hendrix that could be the basis for negligence liability;
argues that the district court’s lump-sum damages award on multiple liability
theories violates the “one-satisfaction” rule; and asserts that the district
court erred in granting declaratory relief and in awarding attorney’s fees
against it.[9]

 

Conspiracy

                        The
district court disregarded the jury’s finding regarding conspiracy on the
ground that THPD had failed to obtain a finding of any damages that were
proximately caused by it.  THPD contends this ruling was error, emphasizing the
general concepts that conspiracy is a derivative tort and that a co-conspirator
may be held jointly and severally liable for the damages caused by the
underlying tort.  See Akin v. Dahl, 661 S.W.2d 917, 921-22 (Tex. 1983).[10] 
Continental responds that the district court did not err in disregarding the
conspiracy finding on this ground.  It also asserts cross-points contending
that no evidence supported a submission for conspiracy and that the submission
omitted the essential element of a “meeting of the minds,” see Chon Tri v.
J.T.T., 162 S.W.3d 552, 560 (Tex. 2005), and that an adverse finding on
that element must be deemed in support of the judgment because THPD neither
objected to the omission, requested a question or instruction in substantially
correct form, nor preserved that contention on appeal.  See Tex. R. Civ. P. 278, 279.  We agree with Continental that THPD’s failure to obtain a jury
finding of the damages caused by any conspiracy precludes its recovery under
that theory and that the district court did not err in disregarding the
“conspiracy” finding the jury made.  Consequently, we need not reach
Continental’s cross-points.

                        The
elements of civil conspiracy include (1) two or more persons; (2) an object to
be accomplished; (3) a meeting of minds on the object or course of action; (4)
one or more unlawful, overt acts; and (5) damages as the proximate result.  Massey
v. Armco Steel Co., 652 S.W.2d 932, 934 (Tex. 1983).  Proof of civil
conspiracy requires proof of “damages as the proximate result” of the
conspiracy.  Id.  “The gist of a civil conspiracy is the damage
resulting from commission of a wrong which injures another, and not the
conspiracy itself.”  Schlumberger Well Surveying Corp. v. Nortex Oil &
Gas Corp., 435 S.W.2d 854, 856 (Tex. 1968).

                        The
charge inquired whether Continental was “part of a conspiracy that damaged
THPD, Inc.”  The district court instructed the jury:

 

 class=Section6>

 

To be part of a conspiracy, an
employee, agent or representative of Continental Imports, Inc. and another
person or persons must have had knowledge of, agreed to, and intended a common
objective or course of action that resulted in the damages to THPD, Inc.  One
or more persons involved in the conspiracy must have performed some act or acts
to further the conspiracy.

 

 

 class=Section7>

The jury was not
asked, in this question or elsewhere, to find the amount of damages proximately
caused by the conspiracy.  Nor has THPD preserved a complaint regarding the
omission of such an issue.

                        THPD
suggests that, under the charge as submitted, the jury necessarily found that
the damages caused by the “conspiracy” were the fraud damages it awarded
against Taylor.  THPD observes that the jury was instructed that a “conspiracy”
must have “resulted in the damages to THPD, Inc.,” and that the issue had been
predicated on a fraud finding against Taylor.  There are several flaws in
THPD’s argument.  First, the conspiracy submission was predicated on any of
three alternative findings:  (1) that Taylor had committed fraud, (2)
that Taylor had committed theft, or (3) that damages had resulted from Taylor’s misapplication of funds or titles.  The jury awarded widely divergent damages
against Taylor for these underlying torts—$277,794.97 for fraud and
misapplication of funds, versus only $35,208 for theft.[11]

                        More
importantly, even if Taylor’s fraud was the sole tort underlying the finding,
it does not automatically follow that whatever damages were caused by the fraud
were also attributable to the “conspiracy” the jury found.  This principle is
illustrated by two cases on which Continental relies, Belz v. Belz, 667
S.W.2d 240 (Tex. App.—Dallas 1984, writ ref’d n.r.e.), and Bentley v. Bunton,
94 S.W.3d 561 (Tex. 2002).  Belz was an appeal of the trial court’s
division of a community estate.  667 S.W.2d at 242.  The jury found that the
husband had defrauded the wife and awarded damages against the husband for
fraud.  Id.  The jury also found that the husband, along with the
husband’s brother and friend, had engaged in a conspiracy to defraud the wife
of her community interest in the marital estate.  Id.  However, the jury
found that the wife had sustained zero damages as a result of the conspiracy. 
Relying on the jury’s fraud finding and damage award against the husband and
the conspiracy liability finding against the two friends, the trial court
imposed joint and several liability against all three defendants for the amount
of the jury’s fraud damages award.  Id.  The Dallas Court of Appeals
reversed, reasoning that “[a]s there were no findings of damages resulting from
the conspiracy, there can be no judgment rendered against those accused of the
conspiracy.”  Id. at 243.  It added that because the wife “failed to
prove an essential element of her cause of action for conspiracy to defraud,
i.e. damages,” there could be no judgment for joint and several liability.  Id.

                        In
Bentley, Bunton, the host of a local public-access television show, and
Gates, a participant on the program, appealed a judgment based on a jury
verdict that each had defamed Bentley, a judge, and conspired to defame him.  See
Bunton v. Bentley, 176 S.W.3d 1, 6 (Tex. App.—Tyler 1999), aff’d in part
and rev’d & remanded in part, 94 S.W.3d 561 (Tex. 2002).  The judgment
awarded Bentley $7,150,000 in actual damages plus $1,000,000 in exemplary
damages for Bunton’s defamation but only $95,000 in actual damages plus $50,000
in exemplary damages for Gates’s defamation.  Id.  While finding that
Bunton and Gates had conspired with one another to defame Bentley, the jury was
not asked to find the amount of damages attributable to the conspiracy, nor did
the trial court impose joint liability on the co-conspirators.  Id. at 16.  Bunton and Gates appealed.  Bentley brought a cross-point urging that,
in light of the jury’s conspiracy finding, Gates should have been held jointly
and severally liable with Bunton for the full amount of damages the jury
awarded against Bunton.  Id. at 15.  Of relevance here, the Tyler Court
of Appeals reversed the trial court’s award of damages against Gates for
defamation but overruled Bentley’s cross-point regarding joint liability based
on the conspiracy finding.  Relying on Belz, the court of appeals held
that “[i]n order to be entitled to judgment for joint and several liability,
Bentley was required to secure a jury finding on the amount of damages he
suffered as a result of the conspiracy itself.”  Id.  at 17.  It further
observed that “[t]he damages found by the jury against Bunton were not
appropriate as against Gates because many of the defamatory acts occurred prior
to Gates’s involvement in the . . . program.” Id.

 

 class=Section8>

                        Both
sides sought review in the Texas Supreme Court, with Bentley again raising his
contention that the jury’s conspiracy finding entitled him to judgment imposing
joint and several liability against Gates for all of the damages the jury
awarded against both defendants.[12] 
Seven of the eight justices participating joined in the judgment affirming the
court of appeals’ judgment that Bentley take nothing on his claims against
Gates.  94 S.W.3d 561, 607 (Tex. 2002).  Other than to acknowledge the court of
appeals’ holding regarding Gates’s joint liability for conspiracy,[13]
the supreme court did not explicitly analyze that issue.  Nonetheless, in
rendering judgment that Bentley take nothing against Gates, the supreme court
necessarily rejected Bentley’s contentions regarding joint liability for
conspiracy and affirmed the court of appeals’ holding.  We further observe
that  Justice Baker, in dissent, advocated Bentley’s view that, as co-conspirators,
Bunton and Gates should have been held “jointly and severally liable for the
total damages the jury found against each individual co-conspirator
defendant.”  Id. at 608 (Baker, J., dissenting).

 

 class=Section9>

                        THPD
questions whether “[t]he Texas Supreme Court in Bentley v. Bunton . . .
misinterpreted the earlier Belz opinion,” but we are bound, as always,
to follow the high court’s holding here.[14] 
THPD also attempts to distinguish Bentley.  It refers to a statement by
the supreme court, describing the court of appeals’ holding, to the effect that
“the evidence did not conclusively establish that all of the damages Bunton
caused were attributable to the conspiracy, such as damages resulting from
statements made before the conspiracy was formed and never ratified by Gates.” 
 Id. at 577.  Citing this language, THPD suggests that Bentley’s
reasoning turned on evidence from television videotapes that conclusively
established exactly when the conspiracy began and that Gates had not
participated in Bunton’s defamatory conduct from the beginning.  THPD observes
that, by contrast, “there are no videotapes of the wrongful conduct in this
case and thus no bright-line test for determining when Continental became
involved in the conspiracy and the amount of damages that had already been
incurred at that point.”  In suggesting that Continental had the burden
of establishing conclusive evidence of when the conspiracy began and that Taylor’s fraud damages were not also attributable to the purported conspiracy, THPD
misconstrues Bentley.

                        The
language in Bentley on which THPD relies merely reflects the principle
that if a party seeking relief fails to submit any element of his affirmative
claim to the jury, it waives that ground of recovery on appeal unless the
evidence conclusively establishes it.  See Wilz v. Flournoy, 228 S.W.3d
674, 676-77 (Tex. 2007); T.O. Stanley Boot Co. v. Bank of El Paso, 847
S.W.2d 218, 222-23 (Tex. 1992) (citing Tex. R. Civ. P. 279).  Because there was
neither conclusive evidence that all of the damages caused by the underlying
defamation were also attributable to the conspiracy, nor a jury finding to that
effect, Bentley could not recover those damages against Gates as a
co-conspirator.  See Bunton, 176 S.W.3d at 17.  Similarly, THPD cannot
demonstrate that the evidence here conclusively establishes that all of the
fraud damages the jury awarded against Taylor were proximately caused by the
“conspiracy” involving Continental—or that any particular amount of damages
were.  To the contrary, there is evidence that Taylor’s defrauding of Hendrix
began long before Kitchen’s transactions with Auto Gallery and that Kitchen and
Continental had relatively little connection to Taylor’s actions thereafter. 
In urging that the evidence provides no “bright-line test for determining when
Continental became involved in the conspiracy,” THPD acknowledges as much.

                        Because
THPD did not obtain a jury finding regarding the damages, if any, that were
proximately caused by a conspiracy between Taylor and Continental, the jury’s
verdict cannot support a judgment imposing liability against Continental for
conspiracy, much less one holding Continental jointly and severally liable as a
co-conspirator for all damages that the jury awarded against Taylor. 
Consequently, the district court did not err in disregarding the jury’s finding
on the conspiracy submission and declining to impose joint and several
liability on Continental for damages awarded against Taylor.[15] 
We overrule THPD’s issues.

Conversion
and theft

                        In
its second issue, Continental challenges the legal and factual sufficiency of
the evidence supporting the jury’s findings that it converted four cars.  We
sustain a legal sufficiency complaint if the record reveals:  (a) the complete
absence of a vital fact; (b) the court is barred by rules of law or of evidence
from giving weight to the only evidence offered to prove a vital fact; (c) the
evidence offered to prove a vital fact is no more than a mere scintilla; or (d)
the evidence establishes conclusively the opposite of the vital fact.  City
of Keller v. Wilson, 168 S.W.3d 802, 810 (Tex. 2005).  The ultimate test
for legal sufficiency is whether the evidence at trial would enable reasonable
and fair-minded people to reach the verdict under review.  See id.
at 827.

                        When
the evidence offered to prove a vital fact is so weak as to do no more than
create a mere surmise or suspicion of its existence, the evidence is less than
a scintilla and, in legal effect, is no evidence.  See Ford Motor Co. v.
Ridgway, 135 S.W.3d 598, 601 (Tex. 2004).  But more than a scintilla of
evidence exists if the evidence rises to a level that would enable reasonable
and fair-minded people to differ in their conclusions.  Id.  We review
the evidence in the light favorable to the verdict, crediting favorable
evidence if reasonable jurors could and disregarding contrary evidence unless
reasonable jurors could not.  See City of Keller, 168 S.W.3d at 807.

                        When
reviewing a challenge to the factual sufficiency of the evidence supporting a
vital fact, we must consider, weigh, and examine all of the evidence in the
record, both supporting and against the finding, to decide whether the verdict
should be set aside.  Plas-Tex, Inc. v. U.S. Steel Corp., 772 S.W.2d
442, 445 (Tex. 1989); Pool v. Ford Motor Co., 715 S.W.2d 629, 635 (Tex. 1986).  We should set aside the verdict only if the evidence that supports the jury
finding is so weak as to be clearly wrong and manifestly unjust.  See Cain
v. Bain, 709 S.W.2d 175, 176 (Tex. 1986).  But we may not merely substitute
our judgment for that of the jury.  Pool, 715 S.W.2d at 635.  The jury
remains the sole judge of witnesses’ credibility and the weight to be given
their testimony.  Golden Eagle Archery, Inc. v. Jackson, 116 S.W.3d 757,
761 (Tex. 2003).

                        With
both legal and factual sufficiency complaints, the starting point of our
analysis—barring a preserved and valid complaint of charge error—is the charge
actually submitted to the jury.  Osterberg v. Peca, 12 S.W.3d 31, 55 (Tex. 2000) (legal sufficiency); Jackson, 116 S.W.3d at 762 (factual sufficiency).

                        In
its submission of THPD’s conversion claims against Continental, the district
court requested the jury to make separate findings as to whether Continental
had “converted” the 1965 Corvette, 1965 Mustang, 1982 Ferrari, and 1992
Corvette.[16] 
The court instructed the jury:  “In order to find that Continental . . .
converted such property, you must first find that THPD, Inc. owned such
property or had a greater right of possession or control of such property.”  See
Smith v. Maximum Racing, Inc., 136 S.W.3d 337, 341 (Tex. App.—Austin 2004,
no pet.).  Assuming it made that determination, the jury was further instructed
that “conversion can be the exercise of dominion and control over property by
selling property without having the right to do so” and that conversion can
include “taking possession of property unlawfully and without authority to the
exclusion of another’s rights.”  The jury found in the affirmative as to all
four cars and found that the value of each car as of the date Continental
converted it was $25,000 for the 1965 Corvette, $9,950 for the 1965 Mustang,
$19,500 for the 1982 Ferrari, and $18,600 for the 1992 Corvette.  The district
court rendered judgment in the amount of the jury awards for the 1965 Mustang,
1982 Ferrari, and 1992 Corvette.

                        As
for the 1965 Corvette, the court awarded THPD a total of $25,000.  $21,618 of
this award was based on the jury’s award of theft damages.  The parties agree
that the 1965 Corvette was the sole basis for the jury’s findings that
Continental had committed theft.  The jury awarded THPD $21,618 in damages on
that claim.[17] 
In an attempt to avoid a double recovery, the district court awarded THPD the
full amount of the theft damages found by the jury ($21,618) plus the portion
of the conversion damages for the 1965 Corvette that exceeded the amount of the
theft damages ($25,000 - $21,618 = $3,382), for a total of $25,000.

                        Continental
maintains that there is legally and factually insufficient evidence that THPD
either owned or “had a greater right of possession” than Continental to any of
the four cars.  Continental’s central contention is that it, not THPD, owned
each car and had the sole right to possess the car.  THPD responds that it held
a security interest in each car that constituted “a greater right of
possession” than any interest Continental might have had.

                        Continental
does not dispute that THPD would have had a security interest, as between it
and Taylor, in a car Taylor purchased with THPD’s loans.  However, it contends,
as one of its principal arguments regarding all four cars, that there is no
evidence that THPD ever perfected its security interests as against third
parties by filing its financing statement with the secretary of state.  See Tex. Bus. & Com. Code Ann. §§ 9.309(1) & cmt. 3 (West 2002 & Supp. 2007), 9.310
(West Supp. 2007), 9.311(d) (West 2002 & Supp. 2007).  The problem with
this argument, as Continental’s counsel acknowledged during oral argument, is
that a copy of THPD’s file-stamped financing statement was admitted into
evidence at trial.[18] 
Nonetheless, Continental urges that this document should be given no probative
effect because it came in as an attachment to a pleading that, in turn, was one
of forty-four attachments to the investigative report of DPS Sergeant Larry
Kocurek, who had investigated Taylor and Auto Gallery.  Over objection, the
district court admitted Sgt. Kocurek’s report into evidence without limitation,
and neither party complains of that ruling on appeal.

                        Continental
invokes the principle that neither pleadings nor attachments to pleadings are
competent evidence.  See Laidlaw Waste Systems (Dallas), Inc. v. City of Wilmer, 904 S.W.2d 656, 660 (Tex. 1995); Carr v. Central Music Co., 494 S.W.2d
280, 281 (Tex. Civ. App.—Austin 1973, no writ).  While that is generally true,
here the financing statement was “introduced into evidence in the course of
trial” and, consequently, may be “considered as evidence.”  Carr, 494
S.W.2d at 281.  We conclude there is evidence that THPD perfected any security
interests it held in the four cars by filing a financing statement covering its
collateral.[19] 
We turn now to arguments that are specific to each vehicle.

            1965
Corvette

                        The
1965 Corvette was one of the cars that Continental had floor planned for
Kitchen.  Pursuant to that arrangement, previously described, the car was
titled to Continental.  In September 1996, Kitchen sold the car to Taylor.  Taylor gave Kitchen a draft for $23,300 and took possession of the car.  Physical
possession of the title remained with Continental, however, and Kitchen later
repossessed the car for non-payment.  Hendrix testified that, in October, THPD
financed $21,000 toward the car.  THPD contends this loan gave rise to a
security interest in the car that constitutes “a greater right of possession”
than Continental had.  For THPD to prevail on this theory, however, there must
be legally and factually sufficient evidence that Taylor’s draft funded such
that title would pass from Continental to Taylor.  See Valley Stockyards Co.
v. Kinsel, 369 S.W.2d 19, 22 (Tex. 1963); Meaders v. Biskamp, 316
S.W.2d 75, 82 (Tex. 1958); Wagal v. SI Diamond Tech., Inc., 998 S.W.2d
299, 300-01 (Tex. App.—Houston [1st Dist.] 1999, no pet.).  Otherwise, Taylor could not have conveyed a security interest in the car to THPD.  See Arcadia
Fin., Ltd. v. Southwest-Tex Leasing Co., 78 S.W.3d 619, 624-25 (Tex.
App.—Austin 2002, pet. denied).  Conversely, if Taylor’s draft did fund
and THPD acquired a security interest in the 1965 Corvette, there is no
question that Kitchen “exercise[d] . . . dominion and control” over the car by
selling it without having the right to do so or took possession “without
authority” to the exclusion of THPD’s interests, so as to support a finding of
conversion under the charge as submitted.[20]

 class=Section10>

                        Continental
urges that there is legally and factually insufficient evidence that Taylor’s draft was ever paid.  Kitchen was the only witness who testified from personal
knowledge regarding that issue.  He recounted that he had repossessed the 1965
Corvette because “I didn’t want to fight with not getting paid.”  He explained
that he would not have taken this step unless Taylor’s draft had been returned
twice unpaid.  Kitchen added that he had also asked Taylor for a cashier’s check—Continental’s
standard policy after a draft was returned twice—but “he couldn’t supply that
so I just went and got my car.”

                        As
for Taylor, he testified that he did not remember paying for the car. 
Consistent with Taylor’s draft not having been paid, Auto Gallery bank records
in evidence do not show a check or draft payment in the amount of $23,300, nor
any debit in that amount.

                        Continental’s
bank statements from the relevant time period were also in evidence.  They
reflect the following:

 

$                      A
credit, dated September 13, 1996, for a deposit of $23,300.

$                      A
debit for the same amount, dated October 2, for “ACH Debit Collection Items.”

$                      A
credit, dated October 9, for a deposit of $23,300.

$                      A
debit for the same amount, dated November 20, that appears in the section of
the statement for “check paid.”  Unlike most other entries in that section, no
check number was indicated.

 class=Section11>

$ 

$                      A
credit for $23,300, dated December 10, labeled “Misc. Credit.”

$                      A
debit for the same amount, dated December 12, for “ACH Debit Collection Items.”

 

 

In sum, the
statements reflected three credits for $23,300 and three debits for the same
amount.

                        Continental
also presented evidence regarding the drafting process it used to facilitate
the exchange of funds and car titles.  To summarize this process, when
Continental received a draft in payment for a vehicle, it would present the
draft for payment, along with the original certificate of title, at its bank,
which would credit Continental’s account.  The bank would then send the draft
and title to the buyer’s bank, who would essentially serve as an escrow agent
holding the vehicle’s certificate of title pending the buyer’s payment of the
draft.  Upon receipt of payment from the buyer, the bank would exchange the
title certificate.  If the buyer did not make payment, the bank would
eventually return the title and unpaid draft to Continental’s bank, which would
then credit the draft amount.  Continental would then either pick up the draft
and certificate of title or instruct the bank to attempt the process again.  If
the draft came back a second time, Continental’s standard policy was to require
the purchaser to bring a cashier’s check or other payment directly to
Continental, although it would sometimes present the draft a third time or permit
other forms of payment.

                        Continental
followed this drafting process with Taylor’s drafts.  It was undisputed that,
as of the time Auto Gallery was shut down, Continental still retained
possession of the 1965 Corvette’s original title certificate.  In the context
of its drafting process, Continental emphasizes that the fact that it held the
vehicle’s title, as well as the transactions reflected in its bank statements,
further established that Taylor never paid the draft.[21]

                        THPD
acknowledges that “no one testified conclusively that Taylor had paid for the
vehicle.”  Instead, it argues that the jury could have reasonably inferred from
Continental’s bank statements and related testimony that Taylor’s draft had
been paid.  THPD emphasizes testimony by Continental’s title clerk, Shelley
Christian, to the effect that returned drafts were ordinarily reflected in its
bank statements as debits for “collection items” or “charge back to account.” 
Following the October 9 deposit for $23,300, a corresponding debit for “ACH
Debit Collection Items” did not appear until December 12.  Instead, on November
20, a $23,300 debit for “check paid” appears (though no check number was
listed).  Continental’s comptroller, Bill Henline, testified without dispute
that Continental did not have any checks outstanding in the amount of $23,300
during this period.  Henline inferred that the November 20 entry “would have
been the return draft.  In other words, the charge-back is misquoted,
miscategorized on the statement as a check paid instead of a, quote, ‘other
debit item.’”  A “Misc. Credit” for $23,300 next appears on December 10,
followed two days later by the “ACH Debit Collection Items” debit in the same
amount.  Henline opined that these entries reflected that, upon receiving the
statement including the November 20 “check paid” entry, he would have called
the bank to inquire as to whether the entry actually reflected the returned
draft, and that the subsequent entries reflected the bank’s correction of the
error.

                        The
bottom line, as Continental suggests, is that the bank statements show three
credits for $23,300, each offset by corresponding debits.  Although the bank
statements do not explicitly identify the $23,300 entries as reflecting Taylor’s draft, nor contain the underlying documentation, there is no evidence that the
entries could have signified anything else.

                        THPD
states that Continental comptroller Henline gave deposition testimony that was
“inconsistent” with his trial testimony.  The totality of this evidence, only briefly
noted at trial, is that Henline made some sort of statement during his
deposition (the record does not elaborate exactly what) expressing a belief
that Taylor’s draft had paid, but that he had not had access to Continental’s
bank statements at the time.  Upon reviewing those records, Henline came to the
firm view that Taylor’s draft had “clearly” not been paid.[22] 
The jury did hear evidence that Henline, as Continental’s comptroller,
supervised the company’s accounting, and that Continental’s title clerk would
ordinarily inform him about checks and drafts that had been returned unpaid
twice, facts that might tend to support the inference that he would be in a
position to know about Taylor’s draft if it had been returned.  However,
without more regarding the nature of Henline’s deposition testimony, we cannot
conclude that the evidence at trial raises more than a scintilla or speculation
that Taylor’s draft was, in fact, paid.[23]

                        Because
we conclude there is legally insufficient evidence that Taylor’s draft was
paid, we sustain Continental’s second issue with regard to the 1965 Corvette. 
Also, because THPD’s theft claim is similarly premised on Taylor’s having paid
the draft, we sustain Continental’s first issue, which challenges the
sufficiency of the evidence supporting the jury’s finding that it committed
theft.

 

            1965
Mustang, 1982 Ferrari & 1992 Corvette

                        The
remaining three cars for which THPD recovered conversion damages were each
transferred by Taylor to Kitchen and Continental.  In September 1996, as noted,
 Taylor bought a 1994 Mercedes S420 from Kitchen, paying with a $50,000
draft.  Between September and November, Continental presented the draft three
times, but the draft was returned each time unpaid.  Although Continental still
held the car’s title, Taylor had already sold the car to a retail buyer, who
had taken possession of the vehicle.  After Taylor’s draft was returned a third
time, Kitchen testified, he began “aggressively trying to get payment for [the]
car.”  Kitchen asked Taylor for a cashier’s check or for the vehicle to be
returned, but Taylor was unable to comply with either request.  Kitchen then
told Taylor that he would “take anything,” and urged:  “Pay me in some way. 
Give me compensation for the $50,000.”  Kitchen eventually agreed to accept
payment in the form of $15,000 cash, the 1965 Mustang (valued at $7,500), and
the 1982 Ferrari (valued at $27,500).  Although Taylor delivered the Ferrari to
Kitchen before Auto Gallery closed, he did not transfer title.  Conversely,
while Taylor transferred title to the Mustang before Auto Gallery closed, the
car remained on Auto Gallery’s lot until Kitchen took possession of it in
January.

                        The
last car—the 1992 Corvette—was purchased by Kitchen from Taylor in September
1996.  Kitchen paid for the car with an $18,500 check, which was paid, and the
certificate of title was reassigned from Auto Gallery to Continental at that
time. As noted, Kitchen left the car at Auto Gallery through the time the
dealership closed, taking possession of it in January 1997, at the same time he
took possession of the 1965 Mustang.

                        Continental
argues that it owned all three cars and that there is legally and factually
insufficient evidence that THPD had “a greater right to possession.”  It relies
primarily on its contention that there is no evidence THPD perfected its
security interests in the vehicles.  We have already rejected that contention.

                        THPD’s
security interests in each of the three cars would have continued, all other
things being equal, notwithstanding their transfer to Continental.  See Tex. Bus. & Com. Code Ann. § 9.315(a) & cmt. 2 (West 2002).  Continental asserts
two grounds by which it could have avoided THPD’s security interests in the
cars.  First, Continental argues that THPD “authorized the disposition free of
the security interest.”  Id. § 9.315(a) (“a security interest . . .
continues in collateral notwithstanding sale. . . or other disposition thereof
unless the secured party authorized the disposition free of the security
interest.”).  Second, Continental contends that it was a “buyer in the ordinary
course of business” with respect to each car.  Id. § 9.320(a) (West
2002) (“a buyer in the ordinary course of business . . . takes free of a
security interest created by the buyer’s seller, even if the security interest
is perfected and the buyer knows of its existence.”).  Both grounds are in the
nature of defenses on which Continental had the burden of proof.  See Montgomery
v. Fuquay-Mouser, Inc., 567 S.W.2d 268, 270 (Tex. Civ. App.—Amarillo 1978,
no writ) (terming authorization of collateral disposition free of security
interest a “defense”); International Harvester Co. v. Glendenning, 505
S.W.2d 320, 321 (Tex. Civ. App.—Dallas, no writ) (buyer in ordinary course of
business was an “affirmative defense”); see also In the Matter of Gary
Aircraft Corp., 681 F.2d 365, 373 (5th Cir. 1982) (Texas law) (“The burden
on this issue does rest with the party claiming the status of a buyer in the
ordinary course of business”).  At trial, Continental did not request a jury
issue or instruction regarding either ground, but objected to the submission of
THPD’s conversion theory altogether, contending it was “not a proper fact
question for the jury [but] a legal question that should be resolved by the court
in light of relevant statutes.”  Consequently, we determine whether Continental
has established, as a matter of law (i.e., conclusively), either that THPD had
authorized Taylor to transfer each car free of its security interests or that
Continental was a buyer in the ordinary course of business.

                        Turning
first to the 1965 Mustang and 1982 Ferrari—the two cars that Taylor traded to
Kitchen in connection with the 1994 Mercedes S420—the evidence is, at best,
disputed whether THPD had authorized Taylor to trade cars in that manner free
of its security interest.  Continental relies on a brief exchange during
Hendrix’s cross-examination in which he was asked whether Taylor “had authority
to trade your cars in your floor plan?”  Hendrix responded, “At times, yes.  He
had the ability to trade them.”  As THPD points out, the security agreement
imposed the following limitations on Taylor’s disposition of collateral and
requirements for terminating THPD’s interest in it:

 

10.       Sale of Collateral and Disposition of Proceeds.  The Debtor agrees not to sell or dispose
of the Pledged Collateral, except that so long as the Debtor is not in default
hereunder, the Debtor shall have the right to sell each item of Pledged
Collateral in the regular course of the Debtor’s business at a price not less
than the minimum sales price therefor specified in the Schedule furnished by
the Debtor to the Secured Party in which such item is identified.  The Debtor
agrees to hold the proceeds of each sale separate and apart from the Debtor’s own
property and not later than the next business day to pay the Secured Party in
cash an amount equal to the minimum sales price.  Upon payment (or so long as
the Debtor is not in default hereunder, on payment of a like amount without any
sale) the Secured Party’s rights in said item of Pledged Collateral and in the
proceeds of such sale shall terminate and any amount so paid to the Secured
Party will be credited on the Debtor’s liabilities to the Secured Party.

 

 

See Tex. Bus. & Com. Code Ann. § 9.315(a) & cmt. 2 (observing that disposition free of
security interest may be authorized “in the agreement that contains the
security agreement”).  The parties dispute whether this security agreement
provision permitted Taylor to trade cars in lieu of cash sales, but even if it
did, this would not conclusively establish that THPD authorized Taylor to extinguish its security interests in the 1965 Mustang and 1982 Ferrari when
transferring them as partial payment of his obligation for the 1994 Mercedes
S320.  The issues here begin with the agreement’s limitation that Taylor was
authorized to “sell” the collateral only “in the regular course of [his]
business,” and it is Taylor’s timely payment of the “proceeds of each sale” (or
equal cash amount) to THPD that causes its security interest to terminate.  See
Associates Discount Corp. v. Rattan Chevrolet, Inc., 462 S.W.2d 546, 549-50
(Tex. 1970) (observing that, under the U.C.C., “[w]hether a sale is in ordinary
course is a mixed question of law and fact, and that question cannot be
resolved without information concerning all the circumstances of the sale.”). 
Considering the circumstances of the transaction, we cannot conclude that, as a
matter of law, the transaction was a “sale” in the regular course of Taylor’s business, as opposed to payment of a debt.  See Chrysler Credit Corp. v.
Malone, 502 S.W.2d 910, 912-14 (Tex. Civ. App.—Fort Worth 1973, no writ).

                        For
similar reasons, we also conclude that Continental has not established as a
matter of law that it was a buyer in the ordinary course of business.  “Buyer
in the ordinary course of business” is defined:

 

A buyer in ordinary
course of business means a person that buys goods in good faith, without
knowledge that the sale violates the rights of another person in the goods, and
in the ordinary course from a person, other than a pawnbroker, in the business
of selling goods of that kind.  A person buys goods in the ordinary course if
the sale to the person comports with the usual or customary practices in the
kind of business in which the seller is engaged or with the seller’s own usual
or customary practices.

 

Tex. Bus. & Com. Code Ann. § 1.201(9) (West Supp. 2007).  A buyer in the ordinary
course of business, however, “does not include a person that acquires goods in
a transfer in bulk or as security for or in total or partial satisfaction of a
money debt.”  Id.  At a minimum, fact issues remain as to whether Taylor “sold” Continental the two cars in accordance with usual and customary practices.  
See Malone, 502 S.W.2d at 912-14.

                        As
for the 1992 Corvette, we likewise conclude that the evidence regarding the
circumstances of the vehicle’s transfer presents fact issues as to whether the
transfer was a sale in the regular or ordinary course of Taylor’s business. 
These circumstances include the fact that Kitchen left the vehicle at Auto
Gallery for several months rather than taking possession and testimony that it
was being offered for sale there.

                        We
overrule Continental’s second issue with regard to the 1965 Mustang, 1982
Ferrari, and 1992 Corvette.

 

Negligence

                        As
noted, the district court submitted the negligence of Continental, Taylor and
TBT, and Hendrix and THPD.  The jury found that the negligence of all three
parties had been a proximate cause of THPD’s damages and that those damages
were $277,294.97, a figure that equaled the calculation in THPD’s damages model
for its total loss of collateral.  The jury apportioned responsibility 85
percent to Taylor and TBT, 10 percent to Hendrix and THPD, and 5 percent to
Continental.  These findings against Continental resulted in a negligence
damages award of $13,864.75.  In an attempt to avoid a double-recovery, the
district court sought to limit Continental’s negligence damages only to the
loss of collateral for which THPD had not been compensated under other theories
of recovery.  It subtracted from $277,294.97 the allocated values for the 1965
Corvette, 1965 Mustang, and 1982 Ferrari in its damages model—respectively,
$21,618, $9,712, and $28,825, for a total of $60,155—to yield $217,139.97,[24]
then applied the 5 percent proportionate responsibility finding to yield
$10,857.

                        In
its third issue, Continental contends that the district court erred in awarding
THPD damages against it under a negligence theory.  The elements of a negligence
cause of action are the existence of a legal duty, a breach of that duty, and
damages proximately caused by the breach.  IHS Cedars Treatment Ctr. of
DeSoto, Texas, Inc. v. Mason, 143 S.W.3d 794, 798 (Tex. 2004).  Continental
urges that, as a matter of law, it did not owe THPD or Hendrix a duty from
which its negligence liability could be predicated.

                        “It
is fundamental that the existence of a legally cognizable duty is a
prerequisite to all tort liability.”  Graff v. Beard, 858 S.W.2d 918,
919 (Tex. 1993).  The existence of duty is a question of law for the court to
decide from the facts surrounding the occurrence in question.  Greater
Houston Transp. Co. v. Phillips, 801 S.W.2d 523, 525 (Tex. 1990).  There is
no general duty to act reasonably toward others.  Rocha v. Faltys, 69
S.W.3d 315, 320-21 (Tex. App.—Austin 2002, no pet.) (observing that the
question of how a reasonably prudent person would act under the same or similar
circumstances, considering any reasonably foreseeable risks or probability of
injury to others “is the test for determining when a duty has been breached,
not the test for whether a duty exists.”).  Instead, THPD must plead and prove
facts that would establish a specific duty on the part of Continental.  Id. at 321.

                        On
appeal, THPD principally relies on the duty to use reasonable care in
supervising aspects of an independent contractor’s work over which one retains
control.  See Fifth Club, Inc. v. Ramirez, 196 S.W.3d 788, 791-92 (Tex. 2006).[25] 
Specifically, THPD argues that Continental retained control over such things as
“financial details of [Kitchen’s] transactions” and his “buying and selling
automobiles” and, therefore, owed a duty to use reasonable care in supervising
those activities.  However, as Continental points out, the supervisory control
giving rise to such a duty “must relate to the activity that actually caused
the injury, and grant the owner at least the power to direct the order in which
work is to be done or the power to forbid it being done in an unsafe manner.”  Id. at 791 (quoting Coastal Marine Serv. of Tex., Inc. v. Lawrence, 988 S.W.2d
223, 226 (Tex.1999)).  The injury-causing conduct made the basis for THPD’s
negligence damages is ultimately Kitchen’s alleged wrongdoing in leaving cars
titled to Continental at Auto Gallery.  THPD claims the presence of these cars
caused him to incorrectly assume or be misled by Taylor that the cars were in
his floor plan, delaying Hendrix’s discovery of Taylor’s fraudulent conduct and
further decreasing the available collateral.

                        As
noted, THPD contended at trial that Kitchen and Taylor had conspired to permit
Kitchen to conduct off-site sales for Continental without the required signage,
in violation of dealer regulations.  He points to the following regulation, as it
appeared at relevant times:

 

 

 class=Section12>

(2)        Sign
requirements.

            

                        (A)       A dealer shall display a conspicuous
sign with letters at least six inches in height showing the name under which
the dealer conducts business.

            

                        (B)       Such sign must be readable from the
address listed on the application for the dealer license.

 

 

 class=Section13>

16 Tex. Admin. Code § 111.10(2).  THPD urges that these claimed violations constituted
negligence per se.  Negligence per se is a common-law doctrine whereby a duty
is imposed based on a standard of conduct in statute rather than the reasonably
prudent person test.  Smith v. Merritt, 940 S.W.2d 602, 607 (Tex. 1997).

                        We
need not decide whether Kitchen and Taylor’s conduct actually constituted a
violation of section 111.10(2) because that regulation does not give rise to a
duty of Continental with respect to Hendrix or THPD.  “The threshold questions
in every negligence per se case are 

 class=Section14>

whether the
plaintiff belongs to the class that the statute was intended to protect and
whether the plaintiff’s injury is of a type that the statute was designed to
prevent.”  See Perry v. S.N., 973 S.W.2d 301, 305 (Tex. 1998).  Section
111.10(2), as THPD’s own expert in motor vehicle laws acknowledged, is aimed at
protecting the car-buying public by ensuring that dealers are clearly
identifiable to the customers to whom they sell.  It corresponds to provisions
in the transportation code governing dealership location requirements and
dealers’ general distinguishing numbers.  See Tex. Transp. Code Ann. §
503.001 (West Supp. 2007).  THPD, as a floor planner or investor in the
dealership where the alleged violations occurred, does not fall within the
class that section 111.10(2) was intended to protect, nor were its claimed
injuries—the loss of his collateral—among those the regulation was designed to
prevent.  See Perry, 973 S.W.2d at 305.  We conclude that Continental
did not owe Hendrix or THPD a duty based on chapter 16, section 110.10(2) of
the Texas Administrative Code.

                        THPD
also suggests that Continental and Kitchen owed it a duty at common law to
ensure that Kitchen promptly removed cars he had purchased from Auto Gallery
lest Hendrix or THPD be confused or misled regarding which cars were in the
floor plan.  THPD does not point to any case where a court has recognized a
negligence duty under circumstances similar to those here.[26] 
For that reason alone, we are hesitant, as an intermediate appellate court, to
recognize such a novel duty here.  See Ex Parte Morales, 212 S.W.3d 483,
488 (Tex. App.—Austin 2006, pet. ref’d); 

 class=Section15>

Petco Animal
Supplies, Inc. v. Schuster, 144 S.W.3d 554, 565 (Tex. App.—Austin 2004, no
pet.).  Nor do we find any support for recognizing such a duty here.

                        The
supreme court has explained the principles that govern the imposition of a
common-law duty:

 

In deciding whether to impose a
commonlaw duty, this Court has applied the familiar factors identified in Graff
. . . Greater Houston Transportation Co. . . . and Otis Engineering
Corp. v. Clark, 668 S.W.2d 307, 309 (Tex. 1983).  The considerations
include social, economic, and political questions and their application to the
facts at hand.  We have weighed the risk, foreseeability, and likelihood of
injury against the social utility of the actor’s conduct, the magnitude of the
burden of guarding against the injury, and the consequences of placing the
burden on the defendant.  Also among the considerations are whether one party
would generally have superior knowledge of the risk or a right to control the
actor who caused the harm.

 

Humble Sand
& Gravel, Inc. v. Gomez, 146 S.W.3d 170, 182 (Tex. 2004) (quoting Praesel
v. Johnson, 967 S.W.2d 391, 397-98 (Tex. 1998)).  “Of all these factors,”
the court has stated, “foreseeability of the risk is the foremost and dominant
consideration.”  Greater Houston Transp. Co., 801 S.W.2d at 525. 
Foreseeability exists when the actor as a person of ordinary intelligence
should have anticipated the dangers his negligent act creates for others.  D.
Houston, Inc. v. Love, 92 S.W.3d 450, 454 (Tex. 2002).

                        Nothing
in the record indicates that Kitchen’s leaving four vehicles at Auto
Gallery—two of which were promptly sold back to Taylor—created a foreseeable
risk of harm to Hendrix and THPD.  Id. at 454.  Even if Kitchen had been
aware that Hendrix or THPD was floor planning Taylor,[27]
we cannot conclude that Kitchen or Continental should have anticipated that
THPD (or whoever might be financing Taylor) would somehow be harmed by the mere
presence of those cars at Auto Gallery.  The evidence established that floor
planners ordinarily employed basic safeguards to verify the vehicles in their
floor plan, such as requiring that vehicle titles be kept in the floor
planner’s possession, and regularly checking the title certificates against
inventory.  Although there was evidence that such precautions were not always
foolproof, the prevalence of such practices in the industry made it highly
unlikely that a floor planner would be so oblivious regarding their collateral
that Kitchen or Continental should be charged with knowledge that merely leaving
a few cars there could cause injury.  See also Greater Houston
Transp. Co., 801 S.W.2d at 525 (generally there is no duty to control the
conduct of others).

                        As
between them, Hendrix and THPD had a superior knowledge, compared to Kitchen
and Continental, regarding which cars were in his own floor plan and was in a
much better position to guard against any risk of loss associated with Taylor’s activities.  See Graff, 858 S.W.2d at 921.  The negligence duty that THPD
seeks to impose on Kitchen and Continental would tend to undermine Hendrix’s
incentives to engage in the most effective means of protecting his interests
and reducing the risk of loss.  See id. at 921-22; General Tel. Co.
v. Bi-Co Pavers, Inc., 514 S.W.2d 168, 173-74 & n.4 (Tex. App.—Dallas 1974,
no writ) (citing Calabresi & Hirschoff, Toward a Test for Strict
Liability in Torts, 81 Yale L.J. 1055, 1060 (1972)) (discussing the concept
of tort liability as a function of opportunity to avoid loss, noting that one
“formulation of this principle is that the test of liability is which party had
the better opportunity to evaluate the risk of loss and the cost of avoiding
it, and to act upon such a decision”).

                        In
light of these considerations, we conclude that Kitchen and Continental owed no
common-law duty to Hendrix and THPD under the circumstances presented.[28] 
Because the absence of a duty negates an essential element of THPD’s negligence
claim, THPD cannot recover on that theory.  We sustain Continental’s third
issue.

 

One-satisfaction
rule

                        In
its fourth issue, Continental argues that the district court erred in awarding
THPD a lump-sum damage award based on theft, conversion, or negligence theories
because it provided THPD overlapping or duplicative recoveries for the same
injuries, violating the one-satisfaction rule.  See Stewart Title Guar. Co.
v. Sterling, 822 S.W.2d 1, 5 (Tex. 1991).  Because we have held that THPD
cannot recover under either its theft or negligence theories, this issue is
moot.  We overrule Continental’s fourth issue.

 

Declaratory
relief & attorney’s fees

                        In
its fifth issue, Continental argues that the district court erred in rendering
a declaratory judgment that THPD “has superior security interest in and right
of possession of the 1965 Chevrolet Corvette, 1965 Mustang, 1982 Ferrari, and
1992 Corvette that are the subject of this suit.”  According to Continental,
the declaration was incorrect as a matter of law.  We have already sustained
that contention with regard to the 1965 Corvette.  Continental further relies
on the rule that a declaratory judgment is unavailable where a party is seeking
in the same action a different, enforceable remedy and the declaration would
add nothing to what is already explicit or implicit in a final judgment
providing that remedy.  See Hageman/Fritx, Byrne, Head & Harrison v.
Luth, 150 S.W.3d 617, 626-27 (Tex. App.–Austin 2004, no pet.). 
Specifically, Continental contends that the declaratory judgment was redundant
of the relief THPD obtained in the judgment awarding damages on its conversion
claims.  See id.  Consequently, Continental asserts, THPD’s declaratory
claim amounted to a mere vehicle for obtaining attorney’s fees.  See id.  Relatedly,
in its sixth issue, Continental maintains that there is no other basis by which
THPD could recover attorney’s fees against Continental in this case.  We must
agree with Continental’s contentions.

                        Here,
as discussed above, THPD’s recovery of damages for conversion turned on the
jury’s findings that it had a “greater right of possession” to the four cars,
due to its security interests, than Continental had.  The declaration that
appears in the district court’s judgment states:

 

The Court further
finds that THPD, INC. is entitled to declaratory judgment and it is therefore
ORDERED that THPD, INC. has superior security interest in and right to
possession of the 1965 Chevrolet Corvette, 1965 Mustang, 1982 Ferrari, and 1992
Corvette that are the subject of this suit.

 

The declaration
added nothing to the determinations that were already explicit or implicit in
the judgment awarding conversion damages.

                        We
acknowledge the district court’s view, expressed during a hearing on entry of
judgment, that the declaratory claim was “indispensable” to the litigation
apart from THPD’s tort claims.  However, we cannot discern, at least from the
record before us, how the declaration and accompanying fee award could be
permitted under Texas law.  We further note that while THPD asserted its
conversion claims as early as 1998, it did not add its declaratory claim
regarding who had the greater right to the four vehicles until 2004.  We are
compelled to conclude that this declaration was error and that any award of
attorney’s fees based upon it was an abuse of discretion.  See id.  We
accordingly sustain Continental’s fifth issue.  Likewise, as none of THPD’s
other claims on which it recovers can support an attorney’s fee award, we
sustain Continental’s sixth issue.[29]

 

CONCLUSION

                        We
affirm the district court’s refusal in its judgment to impose joint and several
liability against Continental for damages awarded against Norm Taylor and TBT. 
We likewise affirm the judgment to the extent it awards damages based on
Continental’s conversion of the 1965 Mustang, 1982 Ferrari, or 1992 Corvette.[30] 
However, we reverse the judgment to the extent it awards THPD damages for the
conversion of the 1965 Corvette, or for theft or negligence, and render
judgment that THPD take nothing on these claims.  We must also reverse the
portions of the judgment awarding THPD declaratory relief and attorney’s fees
and render judgment that THPD  take nothing on those claims.

 

 

                                                                        __________________________________________

Bob Pemberton, Justice

Before Justices Pemberton,
Waldrop, and B. A. Smith

     (Justice B.
A. Smith Not Participating)

Affirmed in part;
Reversed and Rendered in part

Filed:   July
18, 2008









[1]  The corporate name
represents Hendrix’s initials (TH) and those of his wife (PD).





[2]  Kitchen had helped found
and later judged the “Bloomington Gold” event, at which Corvettes are certified
as to authenticity.  He had also consulted with the publishers of the “Black
Book” regarding market values of cars.





[3]  Continental’s
comptroller, Bill Henline, testified that Continental charged Kitchen a monthly
interest rate equal to the rate the dealership itself was paying each month.





[4]  Kitchen described his
work in the wholesale market for high-end specialty cars as involving the
purchasing and selling of such cars between dealers and other wholesalers
across the country.  Unlike the retail market, the wholesale market, according
to Kitchen, was “instant”—“there’s not much deliberation on price.”  He
described a typical transaction:

 

[O]ne
Mercedes dealer in a small town calls me and says he has an S55 . . . a very
expensive car and a small dealership wouldn’t want to keep it.  But a large
dealership in a metropolitan area like Dallas or Phoenix has a lot of use for
those cars.  So the smaller dealership would call me and say, “I have this car
that came in on trade.  I don’t need it.  What can you do with it?”  So I would
call a large metropolitan dealer and say, “This is the car they have.  Do you
want it?  They would say, “Yes, we’ll take it.”  At that point, it’s a sold
unit.

 

. . . . 

 

At that point, I
would make the purchase from . . . the small dealer.  I would send him funds,
pay for the car.  They’d send me the title.  I, in turn, would send the title
to the purchaser of the car.  And the large metropolitan dealer[] would send me
funds. . . .

 

Kitchen added
that, “most of the time, I would never see the car” because “the car would be
shipped from point A to point B,” saving freight costs.  He also noted that in
situations in which he had a buyer, it was a “very common practice” in the
industry to ship the car to the buyer before he had received the title from the
seller and transferred it to the buyer in exchange for payment.





[5]  The district court
ultimately ruled that Taylor had never acquired ownership of the car and
awarded it to the true owner, to the detriment of both THPD, which had been
induced by Taylor to finance the car, and Continental, which had paid Taylor for the car.





[6]  Kitchen testified that
with some of his wholesale purchases, he would not seek a buyer immediately but
wait until market conditions for that particular car improved.  He cited the
example of convertibles, for which there tended to be stronger retail demand in
the spring.  For this reason, Kitchen “would buy convertibles in the fall and
hold them until the spring market and the markup or the monies that I could
make . . . was more than adequate to cover the interest” that would accrue in
the meantime.  The 1992 Corvette was a convertible.  As for the 1954 Jaguar,
Kitchen testified that he was planning to take it to an Arizona car auction the
following spring.  Kitchen added that he had seen the Jaguar on the Auto
Gallery showroom floor in an area that “was roped off so no one could get to it
and very secure.”  Hendrix didn’t recall the Jaguar being in a roped-off area.





[7]  THPD accused Kitchen and
Continental of further harming it by providing “funds” or “financial
assistance” to Taylor and Auto Gallery, which kept the dealership afloat,
which, in turn, caused further loss of its collateral.  As he had with others, Taylor had “bounced” a number of checks and drafts he had given Continental as payment for
vehicle purchases.  THPD complained that Continental, in essence, was too slow
in collecting on those checks and drafts, enabling Taylor effectively to
finance his operations from the float; it also attached significance to
evidence that Continental would sometimes deviate from its standard policy of
requiring payment by cashier’s check if a check or draft had been returned
unpaid twice.  In some such cases, Continental presented Taylor’s drafts for
payment a third time or permitted him to pay with a personal check.  According
to THPD, this was proof that Continental was intentionally helping keep Taylor in business, thereby aiding his fraudulent activities.  In response, Continental’s
witnesses and Kitchen observed that neither had financial incentives to delay
collections—interest on their funds continued to run until they were collected
and paid off, and Kitchen’s sales would not yield net profits to fund his draws
until the payments were collected.  Continental also pointed to evidence of
Kitchen’s aggressive collection efforts regarding the 1994 Mercedes S420 and
1965 Corvette.

 

            THPD
also portrayed as suspicious a transaction in which Taylor had sold an Acura
NSX to Continental for $60,000, transferring the title, and then repurchased
the Acura on the following day for $61,000.  The vehicle never left Auto
Gallery.  Kitchen testified that he had understood that Taylor had a retail
buyer lined up for the car and needed the funds to purchase the car, and that
the transaction was intended as a loan, secured by the vehicle title. 
According to Kitchen, once Taylor purchased the car, Taylor was to sell it to
the retail buyer, collect payment, and pay Kitchen back, with an additional
$1,000.  Kitchen claimed that such transactions were not unusual in the
industry.  As it turned out, by the time of the transaction, the retail buyer
had already paid Taylor for the car and taken delivery, and Taylor had held
only the title.  Kitchen testified that he had been unaware that the retail
buyer had already paid for the car and taken delivery.





[8]  This figure equals the
sum of Continental’s sale prices for the 1965 Mustang and the 1992 Corvette. 
The jury heard evidence that Continental had been appointed receiver of these
two cars and that, through what Continental maintains was an innocent mistake,
its salespeople later sold both cars in violation of the receivership order. 
That the sales may have violated the receivership order is ultimately
irrelevant to our analysis, but we note it only to observe that the jury’s
award on THPD’s intentional interference claim corresponds precisely to the
combined sale prices of these two cars.





[9]  In a cross-point, THPD
asserts, without further elaboration, that “Continental waived error by
repeatedly failing to cite the record when making factual assertions in its
appellate brief.”  We overrule this cross-point.





[10]  In what it
terms a “cross-point” responding to Continental’s issues, THPD observes that
the district court’s imposition of joint and several liability would render
“moot” Continental’s challenges to the damage awards against it.





[11]  Although
the jury did not make itemized findings regarding which cars’ values were
reflected in this damages award, we note that the amount corresponds to the sum
of the values of the 1965 Mustang and 1982 Ferrari in Hendrix’s damages model. 
These were the cars that Taylor traded to Kitchen in response to Kitchen’s
efforts to collect on the 1994 Mercedes S420.





[12]  See Petition
for Review of Bascom W. Bentley, III., No. 00-0139, Bentley v. Bunton
(filed Feb. 12, 2002), at v-vi.





[13]  The supreme
court described the court of appeals’ holding as:

 

Bunton
and Gates were not jointly liable as co-conspirators because Bentley did not
request a jury finding on what damages were caused by the conspiracy itself and
the evidence did not conclusively establish that all of the damages Bunton
caused were attributable to the conspiracy, such as damages resulting from
statements made before the conspiracy was formed and never ratified by Gates.

 

Bentley v.
Bunton, 94 S.W.3d 561, 607 (Tex. 2002).





[14]  We also
reject Hendrix’s argument that the rationale of Belz is limited to its
facts, which involved a jury finding of zero damages from the conspiracy.  The
controlling principle in Belz is that a finding of conspiracy liability
does not ipso facto constitute a finding that the conspiracy resulted in
whatever damages any co-conspirator is found to have caused.  Belz v. Belz,
667 S.W.2d 240, 242-43  (Tex. App.—Dallas 1984, writ ref’d n.r.e.).





[15]  This holding
also obviates THPD’s third issue, in which it contends that Continental’s joint
and several liability for Taylor’s fraud would not be subject to the jury’s
apportionment of responsibility based on THPD and Hendrix’s comparative
negligence.  In any event, Continental concedes that the proportionate
responsibility finding would apply only with regard to THPD’s negligence
claims.





[16]  The
district court also submitted an issue regarding whether Continental had
converted a trailer that Kitchen and Taylor claimed they had co-owned.  The
jury failed to find that Continental had converted the trailer, and THPD does
not challenge that finding on appeal.





[17]  This amount
corresponds to the value THPD’s damages model allocated to the 1965 Corvette.





[18]  The
document identifies the debtor as “TBT, Inc., d/b/a Auto Gallery,” the secured
party as “THPD, Inc., d/b/a AG Auto,” is signed by Taylor and Hendrix, and
identifies “Vehicle Inventory, Cars, Trucks” as collateral.





[19]  Because the
financing statement was in evidence, we need not reach THPD’s alternative
argument that we should take judicial notice of its filing or its cross-point
that the district court erred in excluding THPD’s expert testimony regarding
its security interests.





[20]  In addition
to the above arguments, Continental relies on a line of authorities to the
effect that a conversion plaintiff must prove an “immediate” right to
possession and that a lienholder has no such right until he forecloses.  See State v. First Interstate Bank of Texas, N.A., 880 S.W.2d 427, 429
(Tex. App.—Austin 1994, writ denied).  However, Continental acknowledges
authority that the rule is different where, as here, a security interest has
been perfected.  Villa v. Alvarado State Bank, 611 S.W.2d 483, 486-87
(Tex. Civ. App.—Waco 1981, no writ).  In any event, the charge as submitted
required THPD to prove only “a greater right to possession.”  See
Golden Eagle Archery, Inc. v. Jackson, 116 S.W.3d 757, 762 (Tex. 2003); Osterberg v. Peca, 12 S.W.3d 31, 55 (Tex. 2000).  If the jury found on
sufficient evidence that Taylor had paid for the car, Continental would no
longer own the car and would have had no right to possess it, whether THPD had
foreclosed or not.  Conversely, as a secured creditor, THPD would have had the
greater right to possession, which was all that the jury charge required. 
Consequently, Continental’s challenge to the jury’s finding that it converted
the 1965 Corvette ultimately turns on whether there is sufficient evidence that
payment had been made on Taylor’s draft.





[21]  Evidence of
Continental’s drafting process and that it was followed in Taylor’s vehicle
purchases is also probative of Kitchen’s course of dealing with Taylor in regard to transfer of title.





[22]  In evidence
was an affidavit from Henline that he signed approximately one year after his
deposition.  In it, he avers that “I have now reviewed the financial records
and bank statements for Continental” and concluded that, consistent with his
position at trial, “it is clear that Continental Imports was never paid for the
1965 Corvette.”  He adds, “At the time that I testified that the draft cleared,
I did not have the bank statements in front of me.”





[23]  THPD also
asserts in its brief that Kitchen “admitted during his deposition that the
payment cleared and that there was no documentation to show that the draft had
been returned.”  It cites an exchange between Kitchen and THPD’s counsel at
trial in which counsel was attempting to impeach Kitchen regarding his belief
that Taylor’s draft had cleared.  Kitchen acknowledged that he had made the
following statement during his deposition:  “It says here that the draft was
redeposited on 10-8 and I have—I have nothing that says that it was returned so
it needs to be researched to see whether that—when it went out, what is the title
work.”  Counsel then introduced into evidence what was represented to be a page
from an exhibit at Kitchen’s deposition.  The exhibit consists of a printed
list of three cars, numbered 10-12, with each entry containing what appears to
be some sort of summary of transactions involving the vehicles.  Entry 10 is
titled, “1965 Corvette.”  The accompanying summary, in relevant part, reflects
“10/2/96 Draft Returned” and “10/8/96  Draft Redeposited (Cleared).”  The
origins of this document or who created it is never explained in the record,
though Kitchen’s testimony appears to be his interpretation of what the
document signifies.  Furthermore, the record reflects that Kitchen continued
during his deposition, “This tells me that the draft did come back.  It tells
me someone doesn’t have a copy of the fact that the draft came back.  It tells
me that, the best of my memory, the reason I went and picked up the car was
because the draft was never honored so he never paid for it.  He never received
the title. . . . He didn’t pay for the car so I went and got it.”  Without
more, we cannot conclude that this testimony would have enabled a reasonable
jury to find that Taylor’s draft had been paid.





[24]  The 1992
Corvette had not been included in THPD’s damages model.





[25]  THPD does
not challenge the jury’s findings that Kitchen was an independent contractor of
Continental, not an employee.





[26]  Such a duty
would be akin to imposing liability on a consumer who purchases furniture or an
appliance from a store, based on the consumer’s failure to take immediate
delivery of the purchase, lest one of the store’s creditors be confused or
misled by the store regarding the amount of any inventory that is collateral
for its loan.





[27]  Kitchen
testified that he had been unaware that Hendrix was floor planning Taylor and had instead assumed that one of Taylor’s bank was.  Hendrix claimed, however,
that Taylor had introduced him to Kitchen as Taylor’s floor planner.





[28]  To the
extent that THPD maintains that Kitchen and Continental owed him a common-law
negligence duty related to its collections of Taylor’s checks and drafts, or
the mere fact that Kitchen engaged in business transactions with Taylor from which Taylor might have financially benefitted, we similarly conclude this
contention is without merit.





[29]  For the
same reasons, we overrule THPD’s cross-point urging that the amount of
attorney’s fees awarded against Continental should have been $191,821.





[30]  The total
of these damages, as found by the jury, is $48,050.  Prejudgment interest on
this amount, calculated based on the accrual date and interest rate the
district court utilized, is $16,433.58.